# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 16, 2008 Session

## STEPHEN E. DePASQUALE, M.D. v.
## DONALD H. CHAMBERLAIN, M.D., ET AL.

### Appeal from the Chancery Court for Hamilton County
### No. 06-1087    W. Frank Brown, III, Chancellor

### No. E2007-02015-COA-R3-CV - FILED JULY 15, 2008

Stephen E. DePasquale, M.D. ("Plaintiff") was employed by Chattanooga Gyn-Oncology, LLC. Plaintiff's employment was terminated in August 2006. The parties entered into a negotiated settlement agreement (the "Agreement"), whereby Plaintiff was to receive $49,500 in severance pay, conditioned upon his abiding by the terms of the Agreement. The Agreement also provided that if either party defaulted, the non-defaulting party was entitled to attorney fees if suit was filed to enforce the terms of the Agreement. When Plaintiff did not receive payment, he filed this suit to enforce the terms of the Agreement and sought damages in the amount of $49,500, plus interest and attorney fees. Donald H. Chamberlain, M.D. and Chattanooga Gyn-Oncology, LLC ("Defendants") claimed Plaintiff had breached the terms of the Agreement and was not entitled to any severance pay. Defendants also sought an award of attorney fees. Following a trial, the Trial Court determined that Plaintiff had breached the Agreement and was not entitled to any severance pay. The Trial Court further determined that Defendants were not entitled to an award of attorney fees. Defendants appeal claiming the Trial Court erred when it refused to award them attorney fees. Plaintiff raises a separate issue, claiming that the Trial Court erred when it determined that he had breached the Agreement. We reverse the Trial Court's judgment against Plaintiff, and remand for the entry of judgment in favor of Plaintiff for $49,500, plus attorney fees to be determined by the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Chancery Court Reversed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and SHARON G. LEE, JJ., joined.

John P. Konvalinka and Katherine Higgason Lentz, Chattanooga, Tennessee, for the Appellants, Donald H. Chamberlain, M.D., and Chattanooga Gyn-Oncology, LLC.

James T. Williams and Neil A. Brunetz, Chattanooga, Tennessee, for the Appellee, Stephen E. DePasquale, M.D.

# OPINION

## Background

Plaintiff began working with Chamberlain in July of 2001. When Plaintiff's employment began, the business operated by Chamberlain was known as Women's Health Services, P.C. The name of the company later changed to Chattanooga Gyn-Oncology, LLC. In August of 2006, Plaintiff's employment was terminated and the parties entered into a negotiated settlement agreement. The Agreement, which was in the form of a letter by Chamberlain to Plaintiff, was signed by both physicians and provides as follows:

> After much consideration regarding our practice of medicine, it is clear to me that we have irreconcilable differences. As a result, I regret to inform you that your employment at Chattanooga Gyn-Oncology is terminated effective August 24, 2006. You are welcome to remove any personal items at a mutually convenient time on or before August 31, 2006.
>
> To make this departure as amicable as possible, I propose the following:
>
> 1. You keep the furniture, but not the equipment or computer, which is currently in your office.
>
> 2. You complete any outstanding dictation.
>
> 3. You return all records or copies of records in your possession to Chattanooga Gyn-Oncology's office since those records are owned by Chattanooga Gyn-Oncology. Of course, you will have access to those records for purposes of patient care should that need arise.
>
> 4. You return any other property belonging to Chattanooga Gyn-Oncology and will not copy or obtain any copies of property of Chattanooga Gyn-Oncology.
>
> 5. We will each conduct ourselves in a professional manner.
>
> 6. We agree to conduct ourselves in a professional manner with referring physicians.
>
> 7. All patient records and other practice information remain the property of Chattanooga Gyn-Oncology, LLC. A list of all

patients and Dr. DePasquale's letter containing the first progress note of all active patients will be provided in Word Format (electronically) without charge. In addition, he will receive copies of the cover sheet and the page containing the last progress note. A letter, substantially in the form of Exhibit A[1] attached hereto and made a part hereof, will be forwarded to patients tomorrow.

8. A list of all patients within the next sixty days scheduled for Dr. DePasquale will be furnished to him by 3 p.m. on August 24, 2006.

9. The staff will be provided a protocol message to give the patients asking for Dr. DePasquale in the form of Exhibit B.[2]

10. If either party should default in the performance of any provision hereof, then the non-defaulting party shall be entitled to enforce this agreement and recover a reasonable attorneys' fees in the enforcement hereof.

Beginning today, all patients assigned to you will be notified that you are leaving Chattanooga Gyn-Oncology and they will be given the option of being treated by the practice, so that there will be no interruption of patient care.

I will pay you through August 24 and an amount equal to two months salary (not less than the gross amount of $49,500 which will be reported to the IRS on Form 1099) on Ocotber (sic) 31, 2006 as severance if you have agreed to and complied with all of the foregoing.…

On December 11, 2006, Plaintiff filed this lawsuit for breach of contract claiming that he had complied with the terms of the Agreement, but payment pursuant to the Agreement had not been made to him. Plaintiff sought payment of the $49,500, plus interest and attorney fees.

Defendants answered the complaint, generally denying any liability to Plaintiff. Defendants also filed a counterclaim. In their counterclaim, Defendants asserted that Plaintiff had

---

[1] Exhibit A is a letter to patients giving them the option of remaining with Chattanooga Gyn-Oncology, LLC, or transferring their care to Plaintiff.

[2] Exhibit B is a short statement informing any callers of Plaintiff's new phone number and the location of his new office.

in fact breached the terms of the Agreement and, therefore, was not entitled to the $49,500 or any other relief.  Defendants sought enforcement of the Agreement and an award of attorney fees.

Following a nonjury trial, the Trial Court issued a detailed Memorandum Opinion and Order.  The Trial Court determined that Plaintiff had breached the terms of the Agreement and was not entitled to any relief.  The Trial Court further concluded that Defendants were not entitled to an award of attorney fees.  The Trial Court's memorandum opinion provides, in relevant part, as follows:

> 1.     The Issues.
>
> Paragraph Number 1 of the Settlement Agreement provided that [Plaintiff] would "[k]eep the furniture, but not the equipment or computer, which is in your office."  When [Plaintiff] moved his furniture, he also took with him a clock that was in the hallway and a plant that had been previously in his office.  Dr. Chamberlain also testified that [Plaintiff] removed organizers, an office organizer and some file shelves.
>
> Paragraphs Number 5 and 6 required both physicians to "[c]onduct ourselves in a professional manner" [#5] and "[c]onduct ourselves in a professional manner with referring physicians." [#6].  Dr. Chamberlain alleged that [Plaintiff] failed to comply with these provisions in a number of particulars.
>
> For example, Dr. Chamberlain testified that within two days after August 23, 2006, there were handbills in Erlanger [Medical Center] which stated that surgeons now had a choice of gyn-oncologists.  [Plaintiff's] new office was announced.  Dr. Chamberlain saw this action as an attempt to change unfairly the referral patterns of other physicians and a violation of the agreement.…
>
> [Plaintiff] performed two surgeries on August 24, 2006.  These surgeries were previously scheduled. [Plaintiff] thought his termination was effective at midnight, on August 23, 2006, or on August 24, 2006, at 12:01 a.m.  Therefore, he billed for these two surgeries. Later, [Plaintiff] admitted such was a mistake. He testified that [Defendants] received the money from the insurance company.

Dr. Chamberlain also accused [Plaintiff] of encouraging … Ms. Higdon to report Dr. Chamberlain to various persons.…[3]

Dr. Chamberlain also testified that [Plaintiff] did not pay the bill for the cellphone [Plaintiff] used while he was employed by CGO and after he left CGO.

2.    Factual Analysis.

[Plaintiff] removed furniture from outside his office. He did not return these items. [Plaintiff] testified that the clock in the hallway matched the furniture in his office. The plant had been in his office at one time. The other items were not mentioned by [Plaintiff].

[Plaintiff], or someone for him, printed handbills and placed these handbills in Erlanger Medical Center. The handbills announced the separation of [Plaintiff] from Dr. Chamberlain. This separation allegedly gave surgeons a new choice for their gyn-oncology patients.

[Plaintiff's] cellphone was used by him while with CGO and afterwards, until December 6, 2006. [Plaintiff] did not pay the bill.… [Plaintiff] wanted to keep his cellphone number but establish a new account with Sprint. Apparently, this did not occur, apparently due to Sprint's requirements. [Plaintiff] did not reimburse Dr. Chamberlain these cellphone charges … [which] totaled $329.84 as of February 23, 2007.

Laurie Higdon, R.N., used to work at Erlanger Medical Center as a circulating nurse. She testified in her deposition that Dr. Chamberlain became angry at her because he did not believe she had thoroughly washed the incision before surgery. He dabbed the incision area with a sponge to obtain, and to show Ms. Higdon, the debris she left on the patient. She said he then threw the sponge and hit her in the chest. She made an occurrence report and later talked to a woman in Medical Affairs. About a week later, she called [Plaintiff] and asked him, from a doctor standpoint, what was the

---

[3] The short version of the situation involving Nurse Higdon is Defendants' claim that Plaintiff improperly encouraged her to file criminal assault charges against Dr. Chamberlain. In addition to alleging that Plaintiff encouraged Nurse Higdon to report Dr. Chamberlain, Defendants also alleged that Plaintiff encouraged Dr. Christopher Collier to similarly file a complaint against Dr. Chamberlain. The incident involving Dr. Collier occurred after October 31, 2006, which was the date that Plaintiff was to be paid the $49,500 and the Agreement completed. Therefore, this incident is irrelevant to whether Plaintiff breached the terms of the Agreement. Counsel for Plaintiff and Defendants quite properly admitted at trial that anything occurring after October 31, 2006, was irrelevant.

chain of command within the hospital to have the issue resolved. [Plaintiff] told her the Medical Affairs was the proper committee and that her occurrence report would probably get her there. She denied that he encouraged her to take any additional action. Although she thought the incident could be a criminal assault, she testified that [Plaintiff] did not encourage her to go [to] the police with the matter. She denied telling [another nurse named] Kim Wright that [Plaintiff] told her to go to file criminal charges through the police department.… Ms. Wright remembered Ms. Higdon telling her that [Plaintiff] recommended a police complaint.

* * *

The court concludes that [Plaintiff] did not comply with all of the terms and conditions of the Settlement Agreement, Trial Exhibit 1. He took items from the office of CGO that was outside his personal office. He did not return such. He announced his separation from CGO by posting handbills at Erlanger Medical Center. He did not pay for his cellphone. He interjected himself in the Laurie Higdon matter….

[T]he defendants do not owe [Plaintiff] two months salary or an amount of money not less than $49,500. Because [Plaintiff] is not entitled to recover money under the Settlement Agreement, he is also not due attorney's fees or interest.

Dr. Chamberlain and CGO seek recovery of their attorney's fees in this action. The Settlement Agreement provides:

> 11. If either party should default in the performance of any provision hereof, then the non-defaulting party shall be entitled to enforce this agreement and recover a reasonable attorneys' fee in the enforcement thereof.

First, the Defendants did not bring the lawsuit to enforce the agreement. The Defendants sought to justify their non-payment to [Plaintiff]. It was too late to enforce the agreement. The Settlement Agreement is not like a Contract of Sale where a party can sue to enforce the terms of the agreement.

Second, some of the terms of the Agreement also applied to Dr. Chamberlain. The court holds that there are instances where he

-6-

did not act in a professional manner. For example, throwing a spoiled sponge at a nurse or forceps at a tech are not examples of a professional manner. Also, Dr. Chamberlain's grabbing a resident by the lapels and shaking him is not an example of professional manner. Further, Dr. Chamberlain made complaint to others about [Plaintiff].

Third, CGO cannot recover its attorney fees because it is not a party to the Settlement Agreement.

Therefore, Dr. Chamberlain, and thus also CGO, are not able to recover their attorney's fees from [Plaintiff].

Defendants appeal claiming: (1) the Trial Court erred when it determined that they were not seeking to enforce compliance with the Agreement and, therefore, were not entitled to an award of attorney fees; (2) the Trial Court erred when it found that Dr. Chamberlain also had engaged in unprofessional conduct and, therefore, was not entitled to an award of attorney fees, and (3) the Trial Court erred when it accepted into evidence the deposition of Laurie Higdon and in considering certain portions of that deposition.[4]

Plaintiff claims the Trial Court erred when it determined that he had breached the terms of the Agreement and was not entitled to the $49,500 in severance pay or any other relief. Plaintiff asks this Court to enter a judgment awarding him the severance pay and further to award him attorney fees incurred below, and on this appeal.

**Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure de novo standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In *Segneri v. Miller*, No. M2003-01014-COA-R3-CV, 2004 WL 2357996 (Tenn. Ct. App. Oct. 19, 2004), *perm. app. denied March 21, 2005*, this Court observed that:

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should

---

[4] Defendants also claim the Trial Court erred when it admitted portions of Dr. Christopher Collier's deposition. Because we have already concluded that the alleged incident involving Dr. Collier is not germane to whether the Agreement was violated, *see supra* at footnote 3, we have not discussed most of the trial testimony pertaining to this incident. Due to our resolution of the issues on appeal and because the Dr. Collier incident is not relevant, this issue is rendered moot.

-7-

govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract...." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

*Segneri*, 2004 WL 2357996, at * 4.

In *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917 (Tenn. Ct. App. 1997), this Court noted that in order for a contractual breach to be sufficient to relieve the non-breaching party of its contractual obligations, the initial breach must be "material." In *Adams TV*, we affirmed the trial court's dismissal of a breach of contract claim because the alleged breach was not material. In so doing, we stated:

Upon consideration of the motions to dismiss, the trial court found, and we agree, that any breach of the terms of the Adams TV - ComCorp contract was not a material breach so as to warrant non-performance of the contract by Adams TV. In determining whether a breach of contract is material such that the non-breaching party could avoid performance, Tennessee courts have adopted the criteria established in the Restatement (Second) of Contracts, § 241 (1981), which enumerates the following factors to consider:

(1) The extent to which the injured party will be deprived of the expected benefit of his contract;

(2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

-8-

> (4) The likelihood that the party failing to perform or to offer
> to perform will cure his failure, taking account of all the
> circumstances including any reasonable assurances; and
>
> (5) The extent to which the behavior of the party failing to
> perform or to offer to perform comports with standards of
> good faith and fair dealing.
>
> *See, McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199
> (Tenn. App. 1990).

*Adams TV*, 969 S.W.2d at 921.

We first will address whether any or all of the claimed violations by Plaintiff amounted to a "material" breach of the contract. We will begin with Plaintiff's improper billing of the two surgeries that were performed on August 24, 2006. Regardless of whether the improper billing was inadvertent or intentional, the facts show that Defendants did in fact receive the insurance money for the two surgeries. Therefore, even if this amounted to a breach of the Agreement, such a breach was completely and effectively cured.

As to the items taken from the premises after the severing of the employment relationship, Plaintiff took a clock, a plant, and some file organizers and shelves. The clock apparently was worth around $30. As Dr. Chamberlain testified that Plaintiff could keep the clock, that is no longer an issue. As to the shelves and the plant, these items are of a de minimus value and there is no evidence that Plaintiff's taking these items deprived Dr. Chamberlain of the expected benefit of the contract. *Adams TV*, 969 S.W.2d at 921. We also note that after Dr. Chamberlain refused to pay Plaintiff the severance pay, a letter was sent to Plaintiff's attorney explaining why the payment would not be forthcoming. No mention was made of any items that Dr. Chamberlain claimed were missing from the office. In addition, the fact that these items were of a negligible value is further demonstrated by Dr. Chamberlain's admission at trial that he never requested the return of these items. We conclude that Plaintiff's taking these items which Defendants claims were improperly taken from the office does not amount to a "material" breach of the contract.

The Agreement provides that the parties will conduct themselves in a professional manner. In our opinion, this language cannot be stretched to the point of encompassing the non-payment of the cell phone bill. Plaintiff testified at trial that as far as he knew, the cell phone bill had been paid.[5] Apparently he was incorrect. In any event, a $329.84 unpaid cell phone bill can

---

[5] At trial, Plaintiff objected to the admission of any evidence regarding the unpaid cell phone bill. Plaintiff objected because, prior to trial, Defendants had never indicated that there was an unpaid cell phone bill or that this unpaid bill was a basis upon which they were claiming Plaintiff had breached the Agreement. Plaintiff's objections were sustained and counsel for Defendants later acknowledged at trial that Defendants could "not use [non-payment of the cell phone bill] because you don't think I disclosed it in discovery," to which the Trial Court replied, "Right. Right."

(continued...)

hardly be deemed to have deprived Defendants of the benefits of the Agreement. To the extent it could be deemed to deprive Defendants of the benefit of the contract, Defendants can easily and quickly be compensated for such a de minimus breach. *Adams TV*, 969 S.W.2d at 921. We conclude that the non-payment of the cell phone bill was not a matter even covered by the Agreement; but even if it was, the non-payment of a $329.84 cell phone bill was not a material breach such that Defendants were relieved from paying $49,500 in severance pay.

It is undisputed that after the employment relationship was severed, Plaintiff circulated some fliers announcing that he was no longer employed by Defendants and informing physicians of his new office. The Agreement is not a covenant not to compete. The Agreement does not contain any language even remotely prohibiting Plaintiff from opening his own medical office. Defendants take issue with the flier because it stated that there now was a "choice" for gynecologists/oncologists. Plaintiff's employment had just been terminated and it certainly was understood that Plaintiff would be opening a new office. In fact, Exhibit A and Exhibit B to the Agreement set forth how patients were to be notified of Plaintiff's new office location and phone number. Given that it was clear that Plaintiff would be opening a new office, it necessarily follows that there would be at least some competition for patients. The only way to altogether prevent any competition would be for Plaintiff to locate his new practice a sufficient distance from Chattanooga. Clearly, there now was a "choice" which previously did not exist. We fail to see how stating the obvious in a flier can even remotely be characterized as unprofessional. We note that the flier did not provide any details as to why Plaintiff was no longer working for Defendants and did not contain any disparaging remarks toward Defendants. Plaintiff had every right to announce the opening and location of his new office. The Agreement does not limit or eliminate this right. Therefore, we conclude that Plaintiff's flier announcing the opening and location of his new office and stating the obvious, i.e., that there now was a "choice," cannot be characterized as unprofessional and the Trial Court's holding to the contrary is reversed.

We next discuss the incident involving Nurse Laurie Higdon. The only problem Defendants have with Plaintiff's conduct as to Nurse Higdon is their claim that when Plaintiff was approached by Nurse Higdon concerning her claim that Dr. Chamberlain threw a sponge at her which hit her in the chest, Plaintiff allegedly encouraged her to file a criminal complaint. Plaintiff and Nurse Higdon denied that he encouraged her to file a criminal complaint, but for present purposes we will assume that he did.[6] When a physician is approached by a nurse regarding an alleged assault, we are aware of nothing that would prohibit a physician from discussing with that nurse available

---

[5](...continued)
The record is unclear why the Trial Court later allowed the nonpayment of the cell phone bill to be used substantively against Plaintiff.

[6] It is important to note that Nurse Higdon testified that the incident with Dr. Chamberlain occurred on June 26, 2006, and that she spoke with Plaintiff within one week of the incident. In other words, according to Nurse Higdon, the conversation with Plaintiff occurred one and one-half months *before* the Agreement was entered into. The Trial Court did not address this point in the memorandum opinion.

options. Neither professionalism, the Agreement, nor the peer review process requires a physician to stand mute in such a situation.

There was some dispute at trial over whether Plaintiff initiated the conversation with Nurse Higdon or whether Nurse Higdon approached Plaintiff. As set forth previously in the quote of the Trial Court's memorandum opinion, Nurse Higdon testified that she approached Plaintiff. At trial, Kimberly Wright was questioned about what Nurse Higdon told her. Ms. Wright stated as follows at trial:

> Q.  [W]hat did [Plaintiff] tell [Nurse Higdon], if anything, as far as what he encouraged her to do?
>
> A.  It was my impression by what she was saying that he encouraged her to report an incident that had happened in one of the operating rooms.
>
> Q.  And specifically, was there any mention of criminal charges?
>
> A.  She did mention that. *I'm not sure that he mentioned it to her*, but she did mention it to me.
>
> \* \* \*
>
> Q.  Ms. Wright, you mentioned there was a phone call conversation between [Plaintiff] and Ms. Higdon. Is that what you said?
>
> A.  That's what she expressed to me, yes.
>
> Q.  You don't know whether he called her or she called him or he was returning a call? Do you know the specifics of that?
>
> A.  No, I don't. (emphasis added)

There was no explicit finding by the Trial Court that Plaintiff initiated the call to Nurse Higdon. Given that there was no proof offered that Plaintiff initiated the contact with Nurse Higdon, the facts would preponderate against such a finding.

We conclude that Plaintiff's response to Nurse Higdon, after he was approached by her and informed of Dr. Chamberlain's alleged conduct, cannot be characterized as either unprofessional or as a breach of the Agreement. The Trial Court's holding to the contrary is reversed.

In summary, we conclude that the facts preponderate against the Trial Court's conclusion that Plaintiff was in material breach of the terms of the Agreement. For the reasons set forth above, to the extent that there were any breaches of the Agreement by Plaintiff, we hold that such violations were not material breaches. The judgment of the Trial Court on this issue is, therefore, reversed.

The final issue is Defendants' claim that the Trial Court erred when it admitted the deposition of Nurse Higdon. In its memorandum opinion, the Trial Court stated that the deposition was admitted because Nurse Higdon had moved to San Diego and was unavailable on the date of trial. Defendants argue that because Nurse Higdon's deposition was taken in Chattanooga before she moved to San Diego, she was not more than 100 miles from Chattanooga at the time the deposition was taken and the deposition is, therefore, inadmissible because Nurse Higdon was not "unavailable." Plaintiff disagrees, arguing that when determining if a witness is unavailable because that witness is more than 100 miles away, the trial court must look to whether the witness is more than 100 miles away at the time of trial, not at the time the deposition is taken.

In order to resolve this issue, we look to Tenn. R. Civ. P. 32.01 and Tenn. R. Evid. 804(a)(5) and (6) which provide, in relevant part, as follows:

> **Tenn. R. Civ. P. 32.01. Use of Depositions.** At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Tennessee Rules of Evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof in accordance with any of the following provisions:
>
> \* \* \*
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds that the witness is "unavailable" as defined by Tennessee Rule of Evidence 804(a). But depositions of experts taken pursuant to the provisions of Rule 26.02(4) may not be used at trial except to impeach in accordance with the provisions of Rule 32.01(1).[7]
>
> **Tenn. R. Evid. 804. Hearsay exceptions; declarant unavailable.–**
> (a) Definition of Unavailability. – "Unavailability of a witness" includes situations in which the declarant –
>
> \* \* \*

---

[7] The deposition of Nurse Higdon was not tendered as an expert opinion, but rather as a fact witness.

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process; or

(6) for depositions in civil actions only, is at a greater distance than 100 miles from the place of trial or hearing.

We review a trial court's evidentiary determination under the abuse of discretion standard. *Brown v. Daly*, 83 S.W.3d 153, 157 (Tenn. Ct. App. 2001). We agree with the Trial Court's and Plaintiff's interpretation of the relevant rules. In *Wilkes v. Fred's Inc.*, No. W2001-02393-COA-R3-CV, 2002 WL 31305202, at *5 (Tenn. Ct. App. Aug. 20, 2002), *no appl. perm. appeal filed*, we stated that "[R]ule 804(a)(6) of the Tennessee Rules of Evidence provide[s] that a deposed witness who is more than 100 miles from the court house *at the time of trial* qualifies as an unavailable declarant. Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.32[8] (4th ed.2000)." (emphasis added). Similarly, in *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport*, 169 S.W.3d 627, 642 (Tenn. Ct. App. 2004) we determined that the deponent "clearly met" the standard of "unavailability" for Tenn. R. Evid. 804(a)(6) when the deponent resided in California. In light of the foregoing, we conclude that the Trial Court correctly determined that Nurse Higdon was unavailable.

Defendants further claim that even if Nurse Higdon was unavailable, certain portions of her deposition were inadmissible. The primary reason Defendants seek to have these portions of the deposition excluded is because the Trial Court relied on this particular testimony when it concluded that Dr. Chamberlain also had engaged in unprofessional conduct by throwing the sponge at Nurse Higdon. This claimed unprofessional conduct was one of the reasons the Trial Court concluded that Dr. Chamberlain was not entitled to an award of attorney fees. Because we have concluded that Plaintiff is entitled to enforce the Agreement, neither Defendant is entitled to an award of attorney fees. Thus, the issue of whether Dr. Chamberlain engaged in unprofessional conduct thereby barring an award of attorney fees is rendered moot, which likewise renders this issue moot.

We have carefully considered all of the reasons advanced by Defendants as to why Plaintiff was in breach of the Agreement. After so doing, we conclude that there were no material breaches of the terms of the Agreement by Plaintiff. All remaining issues are rendered moot and are pretermitted. Because this lawsuit was filed by Plaintiff to "enforce" the terms of the Agreement, he is entitled to an award of attorney fees. Plaintiff also has requested an award of attorney fees incurred at the trial court level and on appeal. We conclude this is an appropriate case for the award of attorney fees at both levels, consistent with the terms of the Agreement. On remand, the Trial Court is to determine Plaintiff's reasonable attorney fees incurred below as well as on this appeal. If Plaintiff has not reimbursed Dr. Chamberlain for the cell phone bill, the amount of $329.84 plus any late charges that accrued since the date of trial are to be deducted from the $49,500. The judgment of the Trial Court is reversed and this matter is remanded to the Trial Court for the entry

-13-

of the judgment in favor of Plaintiff in the amount of $49,500, less the phone bill amount, plus attorney fees.[8]

## **Conclusion**

The judgment of the Trial Court is reversed, and this matter is remanded to the Trial Court for entry of a judgment in favor of Plaintiff in the amount of $49,500, plus Plaintiff's reasonable attorney fees. On remand, the Trial Court is to determine Plaintiff's reasonable attorney fees incurred below as well as on appeal. If Plaintiff has not reimbursed Dr. Chamberlain for the cell phone bill, the amount of $329.84, plus any late charges that accrued since the date of trial, are to be deducted from the $49,500. Costs on appeal are taxed to the Appellants, Donald R. Chamberlain, M.D., and Chattanooga Gyn-Oncology, LLC, and their surety.

_____
D. MICHAEL SWINEY, JUDGE

---

[8] While Plaintiff asked for an award of prejudgment interest in his complaint, Plaintiff's initial brief on appeal did not request prejudgment interest. Prejudgment interest was mentioned in Plaintiff's reply brief, but no argument was advanced as to why it was appropriate. Because Plaintiff did not ask for prejudgment interest in his initial brief, Defendants were not given the opportunity to argue against such an award in their brief. For these reasons, we conclude that Plaintiff is not entitled to an award of prejudgment interest.