IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 13, 2010 Session

IN RE:  DESTINY S.

Appeal from the Juvenile Court for Scott County
No. 11225-JUV     James L. Cotton, Jr., Judge

No. E2010-00646-COA-R3-PT - FILED JANUARY 13, 2011

Hank P. ("Father") is the biological father of Destiny S. ("the "Child").  After the Child was removed from Father's home in 2006, the Department of Children's Services ("DCS") eventually filed a petition to terminate his parental rights to the Child.  Following a trial, the Juvenile Court found that clear and convincing evidence existed to terminate Father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3).  The Juvenile Court also found that the evidence established clearly and convincingly that it was in the best interest of the Child for Father's parental rights to be terminated.  Father appeals challenging these findings as well as an evidentiary ruling and the Juvenile Court Judge's refusal to recuse himself.  We affirm the Juvenile Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Andrew N. Hall, Wartburg, Tennessee, for the Appellant, Hank P.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Rebekah A. Baker, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

## OPINION

## Background

The record in this case begins with a petition to terminate Father's parental rights filed by DCS in February 2009.[1]  In the petition, DCS alleged that the Child had been in DCS custody since July 12, 2006, when the Juvenile Court issued an order granting DCS emergency protective custody.  The Child thereafter was found to be dependent and neglected on September 25, 2006.

The Child was born in November 2005 with severe congenital defects which required a tracheotomy and the use of a feeding tube.  The Child first came into DCS custody after being admitted to the hospital for dehydration.  According to the petition:

> DCS removed the child from [the] home because the child was hospitalized due to her medical condition; she was dehydrated and had lost two pounds in one week; she was eight months old at the time and weighed six pounds when taken to the hospital; the child was born with congenital defects; the child used a feeding tube and trach; there was environmental neglect and the unsanitary conditions affected the child's health. . . .

As grounds to terminate Father's parental rights, DCS alleged in the petition that Father had failed to substantially comply with the requirements contained in various permanency plans developed for him over the years after the Child came into DCS custody. The initial permanency plan required Father to obtain a safe, clean, and adequate home, to obtain parenting and mental health assessments, to complete parenting classes, to complete medical training so he could take care of the Child, to obtain reliable transportation, to ensure that the Child's monitor and feeding tube were clean and hooked up properly, and to properly supervise the Child.  Approximately ten months later, a revised permanency plan was created to give Father more time to complete the various requirements.  According to the petition:

> [Father] has not substantially complied with the responsibilities and requirements set out for him in the permanency plans.  He does not have adequate housing which is free from any environmental hazards which would endanger

---

[1] DCS also sought to terminate the parental rights of the Child's biological mother.  The mother's parental rights were terminated by the Juvenile Court, and that decision has not been appealed by the mother and is not at issue in this appeal.

the child. He has not demonstrated that he can monitor the child to ensure that she is breathing and stable at all times, and that her monitor and tubing are clean and hooked up properly. He has not demonstrated that he knows how to operate her feeding machine. He has not acquired or displayed knowledge of her feeding schedule. He does not have his own home. He has not obtained medical training to care for the child. He does not take an active role in her medical care nor did he provide medical care to the child during visits or while she was present in the home. He has not completed a parenting assessment. He has not provided DCS with documentation of his mental health assessment. . . .

DCS made reasonable efforts to help [Father] . . . satisfy the requirements in the permanency plans by instructing [him] to attend physician's appointments and follow physician's recommendations as to how to appropriately care for and feed the child; . . . [helping him] schedule training at Children's Hospital; providing in-home services to work on parenting and environmental issues; advising [him] of appointment times; helping [him] to schedule a mental health assessment[], parenting assessment[], and parenting classes; providing the DCS Health Care Unit Nurse to assist [him] with the child's medical appointments and understanding the physician's instructions; . . . [and] to see if [Father's home was] clean and if [he] could demonstrate proper medical care for the child; . . . providing ongoing case management; providing daily care and support for the child; providing medical and dental care for the child; developing a plan for reunification . . . and ongoing advice and recommendations . . . . (original paragraph numbering omitted)

As an additional ground to terminate Father's parental rights, DCS alleged that the conditions which led initially to the removal of the Child from the home continued to persist or other conditions persisted which in all reasonable probability would lead to further neglect or abuse of the Child. According to DCS, there was little chance that these conditions would be remedied in the near future so that the Child could be returned safely to Father's care. Finally, DCS alleged that it was in the Child's best interest for Father's parental rights to be terminated.

After the petition was filed, Father obtained counsel and a guardian ad litem was appointed on the Child's behalf. The trial was held on February 12, 2010. DCS called Father as the first witness. Father testified that he and the Child's mother, Shay S., are no longer in a relationship. Father currently is married to Judy P. and has been since 1992. Father was married to Judy P. during the three or four years that he lived with the Child's biological mother. Father is once again living with Judy P.

Father testified that he is afraid to give the Child medicine because he "might [accidentally] overdose them or something." He would not be afraid to give the Child medicine "[i]f I knowed how to do it." Father admitted that the Child has had a trach since she was born and he has cleaned it only one time. He has cleaned her trach only one time because he was "afraid to put it back in her neck and jab her too hard." Father has not attempted to obtain any training on his own that would help him take care of the child. Father has not attempted to locate any schools or speech therapy facilities that the Child could attend and that are close to where he lives in the event he was awarded custody. Father was not aware that the Child was receiving physical therapy. Father was aware that the Child was receiving feeding therapy. When asked if he has tried to locate a facility close to where he lives that could provide similar therapy, Father responded "Nope."

Father is not aware of the type of food that the Child is able to eat and how much food she should be given. Father was not aware that the Child also suffered from chronic constipation. Father does not know what an enema is. Father claimed to have attended all of the Child's medical appointments. When asked why he did not know about several of the Child's medical conditions if he really did attend all of the appointments, Father responded it was because "I forget." Father admitted his forgetfulness could be a problem if he had custody of the Child. Father acknowledged that he took the Child to the hospital shortly before DCS obtained custody of the Child. According to Father, he was out looking for a job and when he returned home the Child was blue. He took her to the hospital where she "flatlined" and had to be revived.

Father testified that he did undergo a mental health assessment at a facility located in Scott County, but he is not aware of the results and did not bring them to court. Father completed the parenting assessment in February of 2009 after the petition to terminate parental rights had been filed. Father remembered signing the original parenting plan. He does not remember signing any subsequent plans or the document which explained the consequences of not completing the requirements of the parenting plan. Father testified that both he and his wife currently are receiving disability benefits.

The next witness was Crystal Mitchell ("Mitchell"), who has been employed by DCS for almost five years. Mitchell stated that she first became involved with the Child

in 2006 when she received a referral for environmental neglect. According to Mitchell, the Child had to be hospitalized and after talking to several medical professionals, it was determined that the Child's home environment played a part in her medical condition. The Child was severely dehydrated and had "coded" at the hospital. The Child was removed immediately from the custody of her parents.

Betty Pursiful ("Pursiful") was called as a witness. Pursiful is a registered nurse and is employed by DCS as a nurse consultant. Pursiful became involved with the Child's case because DCS monitors children with medical needs who come into DCS custody. The Child was determined to be medically fragile and was placed with foster parents capable of tending to those medical needs. Pursiful met with the Child's parents at doctor appointments and talked with them on the phone, etc.

According to Pursiful, the Child was placed back in the parents' home on a trial basis in early 2008. Soon thereafter Pursiful received a phone call from a social worker who worked with one of the Child's physicians. The social worker was very concerned because the Child had lost two pounds. Pursiful went to the parents' home and discussed the amount of food the Child was being given, etc. Pursiful stated that while she was going over everything, Father "just sat on the couch. [The mother] mentioned to me several times that he doesn't help her with the [Child's] care . . . ." Pursiful eventually recommended that the trial home placement end. The primary reason for this was the Child's weight and the fact that the Child was not being fed properly. Pursiful added that she has never seen Father attend to any of the Child's medical needs other than transporting her to the doctor. "I've not seen him hands-on take care of her trach or G-tube."

The next witness was Azmat Moinuddin ("Moinuddin"), who works for an outpatient mental health facility. Moinuddin has a master's degree in mental health counseling. Moinuddin performed a parenting assessment on Father. Moinuddin discussed the various scores Father received on the parenting tests and ultimately concluded that Father was not capable of parenting the Child unless certain things were accomplished, including in-home services to help Father deal with a medically fragile child. When asked if her conclusion would change if Father already had been provided these in-home services, Moinuddin stated:

> If they had been provided and in-home services been done and he still scored this way I would have felt like this child would not benefit from this parent or this child would not be taken care of emotionally and physically and for her well-being if he still scored this way after this stuff had been done.

The Child's foster mother, Betty A. (the "Foster Mother"), also was called as a witness. The Foster Mother testified that she first started caring for the Child in July 2006. The Foster Mother described the Child's state of health in July 2006 as "pathetic." She could see the Child's ribs. The Child could not sit up and required a trach and a G-tube. While she was caring for the Child, the Foster Mother called Father and informed him of doctor appointments, etc., and has given Father access to the Child for visitation. Father visited with the Child whenever he was given the opportunity. The Foster Mother also testified as follows:

> Q. Has [Father] attempted to take care of [the Child] medically during any of those visits?
>
> A. No.
>
> Q. Have you tried to show him how to do that?
>
> A. Not lately.
>
> Q. At what point did you?
>
> A. I'm sure there was. He was in the room back early on when I was telling [the mother] things. I don't really remember because she was going to be the primary caretaker, I mean, she said that [Father] wouldn't help her and I had asked [Father] on occasion, I said, are you listening to this . . . because you need to do this. If that trach gets stopped up, you know, this was one incident, will you take care, he said, no, that's [the mother's] job.

According to the Foster Mother, the Child was in good condition at the beginning of the trial home placement. When the Child was returned to the Foster Mother's care after the trial home placement ended, "I cried. Her hair was all matted and she was skinny and she looked terrible. She was shallow and sick." The Foster Mother took the Child to the doctor, and the doctor discovered mold in the Child's trach. The Foster Mother testified at length as to what efforts she goes to on a daily basis to make sure the Child is cared for properly. The Foster Mother acknowledged that Father loves the Child and the Child cares for Father. The Foster Mother has expressed her desire to adopt the Child if the Child becomes available for adoption.

Dianne Davis ("Davis") also testified at trial. Davis has worked for both the Campbell County and Scott County Health Departments. Davis was a care coordinator with the Tennessee Early Intervention Program. Davis assisted the Child's mother in applying for SSI benefits and public housing. According to Davis:

> I would assist if [the mother and Father] had appointments scheduled, if they followed up with appointments I would assist with supplies for the baby because the baby was with the trach, I would assist with special formula if the baby had formula. One major thing I was doing was trying to get the trailer sprayed for bugs. . . .

Davis stated that several appointments had to be rescheduled because the parents missed the original appointment. One of these missed appointments was with a specialist at Children's Hospital.

Carrie Ooten ("Ooten") is a case manager for DCS and testified at trial that the Child first came into DCS custody on July 11, 2006. The Child was taken into DCS custody because of medical and environmental issues. The first permanency plan was developed in July of 2006. At that time, the goal was reunification. With the first permanency plan, both parents were required to: (1) obtain appropriate housing; (2) obtain reliable transportation; (3) attend all medical appointments and therapy sessions; (4) undergo a home health assessment and mental health assessment; and (5) complete parenting classes. The plan later was revised to extend the time in which both parents had to complete the requirements, but the requirements essentially remained the same. The plan was revised a third time when the trial home placement took place. At that time, DCS worked with both parents to link all of the services possible to have a successful transition to the parents' home. When the trial home placement was unsuccessful, the plan was revised yet again, but this time adoption was added as a dual goal in the event the parents were unable to provide a healthy and safe environment for the Child.

When asked the type of services DCS provided to Father in order to help him regain custody of the Child, Ooten stated:

> We provided intensive in-home services through Florence Crittenton, the lady that worked with the family . . . [assisted] with the home and tried to help teach the parents how to keep their home clean. She also worked with them on having positive relationships with one another. She

worked on parenting in regards to [the Child] and her sibling.[2]
She was helpful at times with bringing needed items that the
family might need. She also worked with father and mother on
budgets and financial education. . . .

We set up ETHRA for various appointments or visits and
I also had the opportunity from time to time to assist by taking
the parents to appointments or visits to see [the Child] on a
couple occasions. . . . I did on multiple occasions I took
groceries, personal hygiene items, clothing for [the Child and
her brother], cleaning supplies, and things of that nature,
furniture. I tried to explain in detail the proper way to try to
clean with Clorox wipes and things of that nature because one
of the requirements was that the home be clean for [the
Child] . . . .

Ooten stated that she explained to the mother and Father the importance of
having a clean environment, especially in light of the Child's medical issues. Ooten added
that she personally showed the parents how to clean. Ooten stated that DCS also assisted the
parents in paying bills and provided gas cards so they could attend doctor appointments and
visitation. Both parents went through medical training with regard to the trach and feeding
tube.

Ooten discussed the trial home placement that took place in January 2008.
According to Ooten, the trial home placement ended in February because the Child was
losing so much weight and her health was being impacted. The trial home placement was
revoked at the recommendation of the Child's physicians. At that time, any further visitation
by either parent was supervised.

Ooten testified that Father had unstable housing for a while and lived with his
sister and then went back to his wife. He was scheduled for a mental health assessment twice
but did not show up. Father obtained a parenting assessment in early 2009, which is several
years after the original permanency plan was developed requiring this assessment. Father
obtained the parenting assessment around the time the petition to terminate his parental rights
was filed. Ooten is not aware of Father following the recommendations made in the
parenting assessment. Father has not demonstrated that he knows how to use the medical

---

[2] The parental rights of Father to his son, the Child's brother, are not at issue in this appeal.
However, we note that after Father and the Child's mother ended their relationship, the mother got a new
boyfriend who eventually pled guilty to sexually abusing the Child's brother.

machines. While Father's current housing situation is acceptable and he has reliable transportation, he did not obtain suitable housing until after the petition to terminate parental rights had been filed. Father still cannot take care of the Child's medical needs, notwithstanding the medical training that he received. Ooten recalls hearing Father state that he "doesn't mess with or fool with the medical equipment and he left that to [the Child's mother]." Ooten summed up her testimony by stating that Father has not demonstrated that he is capable of taking care of the Child and it would not be safe for the Child to be returned to his care.

Following the trial, the Juvenile Court entered a very detailed order terminating Father's parental rights. The Juvenile Court stated, in relevant part:

> The child . . . was brought into DCS custody on July 11, 2006, after she was hospitalized in a grave medical condition. DCS had been providing services to [both parents] prior to that date, including advising them of how to keep their home clean and how to attend to [the child's] medical needs. [The biological mother and Father] were paramours and were living together at the time of the removal, though [Father] was married, and is still married, [to Judy P.] On September 25, 2006 . . . there was clear and convincing evidence that the child was dependent and neglected within the meaning of the law, based on the allegations in the Department's Petition, which included that the child was hospitalized, was found to be dehydrated and had lost two pounds in one week, that the child was eight months old at the time and weighed six pounds when taken to the hospital, that the child was born with congenital defects, that the child used a feeding tube and trach, that there was environmental neglect in that the child's surroundings were not sanitary, that there were insects and roaches in the suction tube used to treat the child . . . . The Court ratified permanency plans for the child on August 14, 2006, June 25, 2007, and June 26, 2008. The permanency plan was again revised on June 19, 2009. All the plans were signed by [Father, who also signed] "Criteria and Procedures for Terminating Parental Rights" on July 26, 2006, June 26, 2008, and July 15, 2009.

> The child was placed in the physical custody of the parents on a trial home placement on January 8, 2008. DCS revoked the trial home placement on or about March 2, 2008,

due to the child's physical condition deteriorating since starting the trial home placement. The child had suffered significant weight loss, and her doctors recommended that she be removed from the home. . . .

The child has had surgery on her cleft palate and undergone therapy on a continuing basis to learn how to eat and speak. . . . The Court reviewed the matter . . . in December 2008, and again on March 2, 2009. . . . The Court . . . found that the father did not have a suitable home and had not demonstrated that he could properly care for the child. . . .

The Department filed its Petition to Terminate Parental Rights on February 23, 2009. [Father] was personally served on March 2, 2009. . . . [Father] announced on May 4, 2009, that he had retained counsel. . . . Attorney John Beaty was appointed as the child's Guardian ad litem. . . .

Crystal Mitchell, whom the Court finds to be a reliable and credible witness, is a DCS case manager and was the Child Protective Services case manager at the time of [the child's] removal. She testified that [Father and the biological mother] were residing together . . . at the time of the child's removal. The child was removed due to concerns that the parents were not obtaining proper medical care for the child, were not providing the daily care necessary for the child to remain in good health, and were subjecting the child to environmental neglect that could endanger her health.

DCS made reasonable efforts to prevent the child . . . from coming into DCS custody. Diane Davis, whom the Court finds to be a credible and reliable witness, testified that she worked with the Health Department's Tennessee Early Intervention Services at the time. She advised [both parents] on how to schedule appointments with the child's primary care physician and with providers. She also assisted them with obtaining and scheduling transportation. She assisted them with getting gas money to take the child to the doctor. She advised [both parents of] the importance of keeping medical appointments. . . . She also assisted them in obtaining supplies

such as baby formula. However, she recalled that they missed a specialist appointment at Children's Hospital, and missed other medical appointments.

DCS made reasonable efforts to reunify [the child and Father]. The case manager, Carrie Ooten, whom the Court finds to be a reliable and credible witness, testified that she personally brought cleaning supplies and other supplies . . . to [the parents'] home. She personally demonstrated how to use the cleaning products in the home. . . . Carrie Ooten testified that [Father] was present during the training but did not pay attention to it. Carrie Ooten testified that [Father] stated that he would rely on [the biological mother] to attend to the cleaning and to [the child's] medical needs. Carrie Ooten testified that both parents have completed parenting classes, as well as medical training through Children's Hospital. [Father] completed the medical training twice. Carrie Ooten testified that a service provider was placed in the home . . . to work with them on parenting, environmental, and budgeting issues. She has not received any documentation that either parent has completed a mental health assessment. They only completed the parenting assessment in February 2009. The requirement of the parenting assessment has been on all of the permanency plans since 2006. . . .

[Father] testified that he could take care of [the child] if necessary, but when asked to provide a specific explanation as to [the child's] daily care, including the maintenance and functioning of her feeding machine, he could not do so. He testified that he had not inquired as to whether a school that could meet [the child's] needs was present near his home. He had not inquired as to what doctor [the child] would see should she be in his care. He had not inquired as to where he would take [the child] to obtain feeding and speech therapy. He admitted that during the trial home placement, he had kept [the child] up until midnight explaining that they were "having fun." He denied knowing that this could be detrimental to her health. He testified that he would be "scared" to perform some medical procedures on the child. He testified that he did not know what an enema was and did not know that [the child] often requires one. . . . He testified that he had obtained a mental health

assessment but did not know where he had obtained it. He did not bring the recommendations of the assessment to Court and did not know what the recommendations were.

The Juvenile Court went on to discuss the testimony of the Foster Mother as to the Child's daily medical and nutritional requirements. These requirements included teaching the Child to eat and monitoring the feeding machine, cleaning the feeding tube, giving the Child an enema when necessary, taking her to doctor and therapy appointments, etc. The Juvenile Court noted that according to the Foster Mother, when the Child returned after the trial home placement with the parents, she returned in horrible condition and was very sick. Although the Child no longer has a trach, she still uses a feeding tube.

The Juvenile Court then discussed the testimony of Moinuddin who had testified at trial as an expert and who conducted Father's parenting assessment. The Juvenile Court observed that Moinuddin concluded that Father felt overwhelmed and inadequate to the task of parenting. The Juvenile Court also took note of Moinuddin's testimony that numerous services would need to be provided to help Father properly take care of the Child, and when asked what her recommendation would be if Father already had been provided these services, Moinuddin responded that she would not recommend that the Child be returned to Father.

Based on all of the foregoing, the Juvenile Court concluded that DCS had submitted sufficient evidence to establish clearly and convincingly that grounds had been proven pursuant to Tenn. Code Ann § 36-1-113(g)(2) and (g)(3) in which to terminate Father's parental rights. The Juvenile Court also found that DCS had proven clearly and convincingly that termination of Father's parental rights was in the Child's best interest.

Father appeals claiming that the Juvenile Court erred when it found that grounds to terminate his parental rights had been proven by clear and convincing evidence and that it was in the Child's best interest for his parental rights to be terminated. Father also claims that the Juvenile Court Judge erred when he failed to recuse himself from the case and further erred when he refused to allow Father to make an offer of proof at trial as to excluded evidence.

## Discussion

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights *In re F.R.R., III*, 193 S.W.3d 528 (Tenn. 2006). According to the Supreme Court:

This Court must review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d at 530.

We first address whether grounds to terminate Father's parental rights had been proven by clear and convincing evidence. There were two grounds upon which the Juvenile Court terminated Father's parental rights: substantial noncompliance with the requirements of a permanency plan and continuation of persistent conditions. We will discuss both of these grounds. The relevant statutory provisions provide as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; [and]

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

-13-

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(2) and (g)(3).

With regard to the ground that Father failed to substantially comply with the requirements in his permanency plan(s), we note that several of the critical requirements were completed near or after the time the petition to terminate Father's parental rights was filed and 2½ years after the initial plan was created. These requirements include, but are not limited to, obtaining suitable housing and undergoing a parenting assessment.

Father offered no legitimate explanation as to why these requirements could not have been completed after the initial plan was created and before the petition was filed 2½ years later. In addition, if Father did undergo a mental health assessment, DCS never was informed of the results. While Father did receive medical training, he never successfully learned how to operate the Child's feeding machine and to properly clean the tube. When the petition was filed, Father did not have suitable housing for the Child.

The facts clearly and convincingly establish that Father did not substantially comply with the requirements of his permanency plans so that the Child could be returned to his care. Therefore, we affirm the judgment of the Juvenile Court that the ground to terminate Father's parental rights set forth in Tenn. Code Ann. § 36-1-113(g)(2) had been proven by clear and convincing evidence.

The next issue is whether DCS proved the existence of "persistent conditions" as set forth in Tenn. Code Ann. § 36-1-113(g)(3). There is no doubt that the Child had been

-14-

removed from the Father's home for at least six months and the conditions that led to her removal or other conditions existed which prevented her safe return. These conditions primarily include Father's admitted inability and/or unwillingness to provide the Child with required medical care. If the Child were returned to his care, her safety from a medical standpoint would be questionable, at best. Father was unable to provide the necessary medical care even though he had been provided medical training on two occasions. As such, there is little likelihood that his inability to provide proper medical care would be remedied in the near future. Continuation of the parent/child relationship greatly diminishes the chances of the Child's early integration into a stable and safe home.

In short, this medically fragile Child would be placed at substantial risk if she were returned to Father's care. Accordingly, we affirm the judgment of the Juvenile Court that the ground to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) had been proven by clear and convincing evidence.

We also must determine whether DCS proved by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. The pertinent statute provides as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

-15-

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. §36-1-113(i) (2009).

There is no doubt that Father loves the Child and that there is a bond between them. Nevertheless, Father has not made an adjustment of circumstance such that it would be safe for the Child to return to his care. Even by the time of trial, Father admitted that he did not know how to use and clean the Child's feeding tube and feeding machine. He had over three years to learn this crucial activity. He did not obtain adequate housing until after the petition to terminate his parental rights had been filed. Because Father has not done what was necessary in order for him to be able to take care of the Child's medical needs even though he has had every opportunity to do so, we agree with the Juvenile Court that DCS presented clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

Father's remaining issues are intertwined. Father claims that the Juvenile Court Judge erred when he: (1) denied Father's motion to recuse; and (2) refused to allow him to make an offer of proof consisting of certain testimony of Father's wife that had been excluded as hearsay.

The basis of the motion to recuse involved a hearing that was scheduled for January 2010. Father's attorney was not present when the case was called. He should have been present. Thus, it appeared to the Juvenile Court that Father was unrepresented. According to DCS's attorney:

> Your honor, I was actually present, the Court just called the matter up to the bar . . . [and] the Court simply asked . . . whether or not this was going to be a contested matter and I said I don't know. The Court turned to [Father] and I believe the Court said, is your attorney coming, and he said no, he can't be here. Then the Court asked if he was going to surrender, if this was going to be a hearing, and I believe [Father] responded he didn't know, he didn't talk to his attorney and that was the end of it.

Father took the Juvenile Court's questions as to whether he was going to contest the petition as the Court being prejudiced against him and suggesting that in the Court's opinion he should surrender his parental rights. Testimony by Father's wife as to what was said by the Juvenile Court Judge was excluded as hearsay and the Juvenile Court Judge told Father that he did not have the right to direct questions directly to the Judge. We note that the Juvenile Court Judge did state that he had no specific recollection of talking with Father but indicated that he typically inquired when a case was called as to whether the case was settled or was going to trial. The Juvenile Court Judge also stated that he could not conceive of a situation where he would require a party to proceed without his or her attorney.

We review a trial court's evidentiary decisions under the abuse of discretion standard. *DePasquale v. Chamberlain*, 282 S.W.3d 47, 57 (Tenn. Ct. App. 2008). Initially, we note that the irony has not escaped us that this whole situation was caused by Father's attorney not showing up for court and is now being used by Father to assert error. *See* Tenn. R. App. P. 36(a) which provides that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." We also note that DCS's attorney and the other attorneys in this case were not made aware until the morning of trial and after all available witnesses were present at court that Father was going to seek recusal.

-17-

The Juvenile Court Judge stated on the record that he did not recall any specific conversations with Father so there was no offer of proof to be made regarding the Judge's potential testimony. Accordingly, we need not, and do not, express any opinion on whether the Judge should have answered questions submitted to him concerning the events in court that January 2010.

We agree with Father that the Juvenile Court should have allowed Father to make an offer of proof regarding the proffered testimony of Father's wife.[3] Nevertheless, we have reviewed the entire record in this case several times and there is absolutely nothing in the record that would even remotely suggest that the Juvenile Court Judge was in any way prejudiced against Father. Because Father was afforded a constitutionally sound and fair trial in every respect, to the extent that anything said to Father a month before the trial when the Juvenile Court Judge was calling the docket could be misinterpreted as showing prejudice, we find such error in not allowing Father to make an offer of proof as to his wife's testimony to be harmless. We pretermit whether the proffered testimony of Father's wife was properly excluded as hearsay.

"Concerning the recusal issue, whether recusal is warranted is left to the discretion of the trial judge, and such decision will not be reversed absent a clear abuse of discretion on the face of the record." *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 546 (Tenn. 2004)(citing *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)). Because the record supports a conclusion that, at most, Father misunderstood what he was being told when the Juvenile Court Judge was calling the docket, and because the record fully supports a conclusion that Father was afforded a fair trial in all respects, we conclude that the Juvenile Court Judge did not abuse his discretion when denying Father's motion to recuse.

---

[3] No transcript is available from this hearing where Father claims prejudicial statements were made to him.

**Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Scott County Juvenile Court solely for collection of the costs below. Costs on appeal are taxed to the Appellant, Hank P., and his surety, for which execution may issue, if necessary.

_____
D. MICHAEL SWINEY, JUDGE